IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

MICHAEL L. VRENTAS, JR.                                              PLAINTIFF

         VS.                    Civil No. 2:14-cv-02060-MEF

CAROLYN W. COLVIN,
Commissioner of Social Security Administration                      DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Michael L. Vrentas, Jr., brings this action under 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying his claim for a period of disability and disability insurance benefits ("DIB"), and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

**I.  Procedural Background**

Plaintiff protectively filed his application for DIB on October 21, 2011. (T. 137-138, 176) He also protectively filed for SSI on May 8, 2012. (T. 139-144) In both applications, Plaintiff alleged an onset date of June 1, 1991, due to: schizo-affective; obsessive-compulsive disorder; low I.Q.; and, MRSA. (T. 179) His applications were denied initially on March 7, 2012, and upon reconsideration on June 4, 2012. (T. 66-68, 72-73) On July 18, 2012, Plaintiff requested an administrative hearing. (T. 77-79) The hearing was held on December 13, 2012, before the Hon. Harold D. Davis, Administrative Law Judge ("ALJ"). (T. 25-62) Plaintiff was present and testified at the hearing. A

-1-

vocational expert, Larry Seifert, also appeared and testified at the hearing. Plaintiff was represented at the hearing by counsel, Kevin R. Holmes. (T. 25, 27)

Plaintiff was 35 years old at the time of the hearing. (T. 31) He had an 11th grade education and had not obtained a GED. (T. 31) He had past relevant work ("PRW") experience as a short order cook, a poultry de-boner, a pallet operator, a fast-food cook, a retail stocker, a car wash attendant, and a dishwasher. (T. 56-57) Plaintiff stopped working on December 31, 2010 "because of other reasons," which he explained as "terminated." (T. 179) He later advised a consultive examiner that his last employment "ended when he had an MVA." (T. 342) Plaintiff's earnings records reflect earnings of $10,767.43 in 2010, and some earnings in 2011. (T. 145, 155-156)

In a Decision issued on February 8, 2013, the ALJ found that although Plaintiff has the following severe impairments, personality disorder, major depression and borderline intellectual functioning (20 C.F.R. § 404.1520(c) and 416.920(c)), Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (T. 12-15) The ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following non-exertional limitations: to do work involving simple tasks and simple instructions and requiring only incidental interpersonal contact with others. (T. 15-19) With the assistance of a vocational expert, Larry Seifert, the ALJ determined that Plaintiff is able to perform his past relevant work as a poultry de-boner (DOT#525.687-066), dishwasher (DOT#318.687-010) and pallet operator (DOT#920.685-078). (T. 19) The ALJ then concluded that Plaintiff has not been under a disability, as defined in the

Social Security Act, from June 1, 1991[1] through the date of the ALJ's Decision. (T. 19)

Plaintiff appealed this decision to the Appeals Council (T. 5), but said request for review was denied on January 23, 2014. (T. 1-4) Plaintiff then filed this action on March 25, 2014. (Doc. 1) This case is before the undersigned pursuant to the consent of the parties. (Doc. 8) Both parties have filed appeal briefs (Doc. 10 and 13), and the case is ready for decision.

## II.  Standard of Review

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir.

---

[1] During the administrative hearing, the alleged date of onset of disability was amended to January 1, 2011. (T. 35)

2000).

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a medically determinable physical or mental impairment that has lasted at least one year and that prevents her from engaging in substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3) and 1382(3)(c). A claimant must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require application of a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. 20 C.F.R. §§ 404.1520(a)- (f)(2003).  Only if the final stage is reached does the fact finder consider the claimant's age, education, and work experience in light of his or her residual functional capacity. *McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. §§ 404.1520 and 416.920 (2003).

### III.  Discussion

The Court must determine whether substantial evidence, taking the record as a whole,

supports the Commissioner's decision that Plaintiff was not disabled from the alleged date of onset on January 1, 2011 through the date of the ALJ's Decision on February 8, 2013. Plaintiff raises three issues on appeal, which can be summarized as follows: (A) the ALJ gave improper weight to the opinions of non-treating consultative examiners, whose findings were not supported by substantial evidence, causing error in the ALJ's RFC determination; (B) the ALJ failed to evaluate Plaintiff's GAF scores; and, (C) the ALJ failed to follow proper legal standards in evaluating Plaintiff's subjective complaints, medical records and RFC. (Doc. 10, pp. 3, 7-17) Each issue is addressed in turn.

### A.  Weight Given To Expert Opinions

Plaintiff first contends that the ALJ improperly gave greater weight to the opinions of non-treating examiners, as opposed to his various treating physicians, concerning the functional limitations associated with his mental impairments. He further contends that the non-treating examiners' findings are unsupported by substantial evidence in the record, and that reliance upon them resulted in error in the ALJ's determination of Plaintiff's RFC. The Court disagrees.

The opinion of a treating physician is accorded special deference and will be granted controlling weight when well-supported by medically acceptable diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000). These opinions are not automatically controlling, however, because the record must be evaluated as a whole. *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005). The Court will uphold an ALJ's decision to discount, or even disregard, the opinion of a treating physician where "other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the

credibility of such opinions." *Id.* at 920-21 (internal quotations omitted). *See also Halverson v. Astrue*, 600 F.3d 922, 929-30 (8th Cir. 2010)(explaining that "[w]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight" (internal quotation marks and citation omitted)). It is the ALJ's role to resolve conflicts among the opinions of various treating and examining physicians. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007).

Plaintiff's characterization of Robert L. Spray, Jr., Ph.D. as a "treating physician" is misplaced. The record shows that following Plaintiff's consultive examination by Stephen P. Nichols, Ph.D. on February 21, 2012, Plaintiff sought no treatment at all for his mental conditions for almost five months before scheduling an appointment with Dr. Spray on July 13, 2012. The appointment with Dr. Spray was a self-referral as "[h]e is applying for disability benefits," and Plaintiff stated that, "[m]y attorney told me to find someone to get me evaluated so I could get medicine." (T. 342) Plaintiff complains that the ALJ "made little mention of the length of [Plaintiff's] mental impairments" (Doc. 10, p. 9), but this is necessarily so because there are absolutely no  records of any mental health treatment sought by Plaintiff as an adult before his application for disability benefits, and during that time he was able to engage in substantial gainful activity. The evidence of record plainly shows that Plaintiff had not been under any treating physician's care for many years, and he was not taking any medications. For instance, in his Disability Report dated November 30, 2011, Plaintiff indicated that he was not currently taking any medications (T. 181); his mother, in a Third-Party Function Report dated February 21, 2012, reported that "Michael needs to be on medication, but he is non-compliant," and that he did not currently take medicines (T. 193, 199); in a consultive general physical exam performed on February

9, 2012, Dr. Clifford Evans stated under his psychiatric review "no treatment in 8 years" (T. 299); and, in another Disability Report dated May 11, 2012, Plaintiff indicated that he was not scheduled to see any medical provider, nor was he taking any medications (T. 206-207). Dr. Spray's records confirm that no treatment was provided to Plaintiff during that one visit, and no further appointments for any treatment were scheduled. Further, despite Plaintiff stating that he wanted to get evaluated so he "could get medicine," no referral to any physician was made for that purpose. (T. 342-345) At the time of the administrative hearing on December 13, 2012, Plaintiff testified that he was not seeing any physician for treatment, nor was he taking any medications for his mental illness. (T. 42) Under such circumstances, the Court does not believe that Dr. Spray was a "treating physician" whose opinion was entitled to be given controlling weight.

The Eight Circuit has repeatedly held that visiting doctors in order to receive benefits does not support a finding of disability. *See Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995)(plaintiff's encounters with doctors appeared to be linked primarily to quest to obtain benefits, rather than to obtain medical treatment).

The ALJ noted that Dr. Nichols had the Plaintiff complete the Wechsler Adult Intelligence Scale, 4th edition (WAIS-IV) as part of his examination and evaluation. (T. 17) Plaintiff's full-scale IQ score was 78, and Dr. Nichols remarked that "although the claimant's intelligence is low, he is not mentally retarded." (T. 308) A similar finding was made by Dr. Spray who, without doing any objective testing, estimated Plaintiff's IQ and determined it to be "low average." (T. 344) The ALJ also commented that Dr. Nichols, based on his evaluation, thought that Plaintiff had the capacity to cope with the typical cognitive demands of basic work tasks, to attend and sustain concentration on basic tasks, to sustain persistence in completing tasks and to complete work-like tasks within an

acceptable time frame. (T. 17, 309) From this, the ALJ concluded that Dr. Nichols' objective testing supported a finding in RFC that Plaintiff can only do simple tasks with simple instructions, but no greater limitations. (T. 17) Noting that Dr. Nichols only saw Plaintiff once, the ALJ found that if Plaintiff were as limited as alleged, it would be expected that Dr. Nichols would have observed greater limitations in Plaintiff's abilities to persist and concentrate. (T. 17) In fact, the record shows that Plaintiff did not even specify any current symptoms of obsessive compulsive disorder or schizophrenia to Dr. Nichols, no perceptual abnormalities (such as auditory or visual hallucinations) were noted, and Dr. Nichols reported that "[i]f Mr. Vrentas suffers from schizophrenia or obsessive compulsive disorder, I was unable to document such symptoms." (T. 306-308)

Since Dr. Nichols' findings were based on objective testing, the ALJ gave them great weight with regard to the Plaintiff's ability to do work with simple tasks and simple instructions. (T. 17) Concerning social functioning[2], the ALJ remarked that Dr. Nichols noted that Plaintiff had numerous conflicts with bosses and did not get along with his brother, and that Plaintiff's abilities to participate in social groups and to communicate and interact in a socially adequate manner were impaired by his personality disorder and his difficulty relating to others; however, Plaintiff still had the cognitive capacity to communicate in an intelligible manner, and he could still cope with the typical cognitive demands of basic work tasks. (T. 17, 308-309) Those findings were relied on by the ALJ in determining that Plaintiff's RFC should include a nonexertional limitation requiring only incidental contact with others. (T. 18) The ALJ further noted that if Plaintiff were was limited in dealing with others as alleged, it would not be expected that he could communicate in an intelligible manner or

---

[2] A claimant's capacity to interact independently, appropriately, and effectively on a sustained basis with others. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(B)(4).

cope with the typical cognitive demands of basic work tasks. (T. 18)

During his one visit with Plaintiff, Dr. Spray reported that Plaintiff complained of "loss of concentration *trying to do multitask*." (T. 342) (Emphasis added.) Plaintiff, it was noted, did not repeat any grades in school, and dropped out of school because "[he] thought [he] could work - become successful some other way 'cause [he] didn't want to do it." Plaintiff then told Dr. Spray that in his senior year of high school he was not getting along with his parents "because he was partying," and he was worried about knowing all of the States on the map for history. (T. 342) In discussing his past employment, Plaintiff told Dr. Spray that he last worked one year before, which "ended when he had an MVA"; that his longest period of employment was for one year at Tyson, and he quit that job because "it just got old - wasn't what I really wanted." (T. 342) Regarding social functioning, he advised Dr. Spray that previously lived in Liberty, Missouri with a girlfriend for close to a year; that he has "some difficulty" relating to his brother; that he has no friends; and, that in the past "he might talk to someone at work, but did not have friends." He explained the reason for this as, "I don't understand people. . .they don't understand me." (T. 343) Plaintiff confirmed that he was not taking any medication for his mental health. (T. 343)

Dr. Spray conducted a clinical interview and mental status exam. Plaintiff was oriented to time, place and person, although he was one day off on the date and did not know the day of the week. Concerning memory and concentration, Plaintiff was able to recall six digits forward and three digits backward; he counted backwards from 20 with no errors; days of the week were recited forward and backward with no errors; two out of three items were recalled after five minutes; and, he knew his date of birth, telephone number, address, and social security number. (T. 344) Plaintiff was cooperative, his affect was appropriate, but his mood was anxious. In describing his mood,

Plaintiff related that "sitting in the trailer - opening the door and look out on nothing is driving me nuts. . .I'm a city guy. . .It's freaking killing me." (T. 345) Dr. Spray's diagnostic impressions were: schizoaffective disorder vs. mood disorder, not otherwise specified; history of polysubstance abuse, reportedly in long-term remission; personality disorder with schizotypal and paranoid features; and, a GAF of 40-50. (T. 345) As mentioned above, no treatment was provided, no treatment plan was prepared, no follow-up visit was scheduled, and no referral to any other mental health professional was made.

In completing a Mental Residual Functional Capacity Assessment, Dr. Spray reported that Plaintiff's ability to remember locations and work-like procedures was not significantly limited, nor was his ability to understand and remember very short and simple instructions, be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, or to set realistic goals or make plans independently of others. (T. 346-347) Plaintiff's ability to understand and remember detailed instructions was noted to be moderately limited. Moderate limitation was also reported for Plaintiff's ability to: carry out very short and simple instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and, to respond appropriately to changes in the work setting. (T. 346-347) On the other hand, Dr. Spray concluded that Plaintiff was markedly limited[3] in his ability to: work in coordination  or proximity to others

---

[3] A limitation is considered "marked" if it is "more than moderate but less than extreme." *Id*. § 12.00(C).

without being distracted by them; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; and, get along with coworkers or peers without distracting them or exhibiting behavioral concerns. (T. 346-347)

The ALJ found Dr. Spray's minimal and moderate limitation findings to be consistent with Dr. Nichols' objective IQ testing, and such findings were given substantial weight. (T. 18) Those findings were taken into account by the ALJ in his RFC determination that Plaintiff could do work involving only simple tasks with simple instructions requiring only incidental contact with others. The ALJ took issue with Dr. Spray's findings that Plaintiff had marked limitations in some areas of concentration and persistence and with social interaction. The ALJ noted that such findings conflicted with Dr. Nichols' conclusion that although Plaintiff would have problems interacting with others, he did not have marked limitations in those areas. Of particular concern to the ALJ was the fact that there was no indication in Dr. Spray's report that Plaintiff's condition had worsened since Dr. Nichols's evaluation on February 21, 2012, and he also noticed that Plaintiff's inability to shop was the result of a lack of money and not due to Plaintiff's condition. (T. 18) Accordingly, the ALJ gave little weight to that portion of Dr. Spray's opinion.

The Court sees no error in doing so based on the evidence of record as a whole. During an emergency room visit (knee infection) on October 27, 2010, the psychiatric review section indicates "no depression, no suicidal or homicidal ideations, no anxiety," and while Plaintiff stated that he had a psychiatric illness in his childhood that he received treatment for (Plaintiff was not sure what it was

or how it was treated), "he is no longer followed for this condition." (T. 240) In March, 2011, during emergency room visits for an injury to his left hand (incurred at work), the psychiatric review reflects "denies mental health complaints." (T. 272) Those records also reflect that psycho-social support is provided by his girlfriend. (T. 280) Dr. Evans' general physical consultive examination report dated February 9, 2012 shows "no treatment in 8 years" for any psychiatric conditions. (T. 299) Plaintiff did not specify any current symptoms of OCD or schizophrenia during Dr. Nichols' evaluation, no perceptual abnormalities were observed, and the diagnosis of personality disorder was due to Plaintiff's past history of anti-social behavior (DWIs and conflicts with bosses). (T. 306-308) In addition, and despite Plaintiff's argument to the contrary, there is no substantial evidence to support a conclusion that Plaintiff's condition significantly worsened in the five months in between the evaluation by Dr. Nichols and the evaluation by Dr. Spray. Plaintiff had not sought any mental health care during that time. He reported no worsening of his condition in a Disability Report dated May 11, 2012. (T. 203) He did not complain to Dr. Spray that his condition was worsening, nor was he there to seek any treatment from Dr. Spray; instead, the appointment was linked primarily to Plaintiff's effort to obtain disability benefits.

The ALJ's determination of Plaintiff's RFC is further supported by the opinion of Jon Etienne Mourot, Ph.D., a state agency consultant who completed a review of the available evidence on March 2, 2012. Dr. Mourot found that Plaintiff was not significantly limited in his ability to understand, remember and carry out very short and simple instructions, to maintain attention and concentration for extended periods, to make simple work-related decisions, and to ask simple questions or request assistance. (T. 318-319) Dr. Mourot concluded that the objective evidence "does not support marked impairment in adaptive functioning," and that Plaintiff is able to perform work

where interpersonal contact is incidental to work performed, complexity of tasks is learned and performed by rote, tasks have few variables and require little judgment, and where supervision required is simple, direct and concrete. (T. 320) These findings, the ALJ noted, were consistent with the objective test results and other findings set forth in Dr. Nichols' report. The ALJ also pointed out that while Plaintiff's mother stated in her function report that Plaintiff was quite limited, Dr. Mourot noted that Plaintiff's mother only sees him every few months, and this showed that Dr. Mourot had evaluated the evidence thoroughly. (T. 19, 320) Although Dr. Mourot did not have the benefit of seeing Dr. Spray's report, there is no substantial evidence to support Plaintiff's argument that his mental condition worsened in between the date of Dr. Mourot's evaluation on March 2, 2012 and the date of Dr. Spray's appointment on July 13, 2012.

Plaintiff also argues that the ALJ erred in not considering the reports from Summit Medical Center and Springwoods Behavioral Health in determining Plaintiff's RFC. (Doc. 10, p. 10) Those records, however, add little to the evidentiary picture concerning Plaintiff's RFC for the following reasons.

While the reports and opinions of Dr. Nichols, Dr. Spray, and Dr. Mourot were discussed in depth by the ALJ in his Decision, the records from Summit and Springwoods, in contrast, provided no assessments relative to a determination of Plaintiff's RFC. During his evaluation by Dr. Spray, and when asked about any crying spells, Plaintiff reportedly stated, "[s]ometimes I am to the point I want to get a gun and shoot myself. . .I have thoughts of waking up and just. . ." (T. 343) Dr. Spray, however, apparently found no basis to be concerned by such statements as his report reflects no diagnosis of suicidal ideations. (T. 345) On July 19, 2012, just six days after seeing Dr. Spray, Plaintiff presented to the emergency room at Summit Medical Center in Van Buren, Arkansas with

a chief complaint of suicide ideation. (T. 355) The symptoms/episode began at "an unknown time." (T. 356-357) A history of schizophrenia and similar episodes in the past were reported by Plaintiff's brother, and he advised that he brought Plaintiff in for evaluation as Plaintiff "has been non compliant with meds for a long time and wanted to shoot himself at home." (T. 357) Just under three hours later, Plaintiff was discharged by Summit and transferred to Springwoods Behavioral Health in Fayetteville, Arkansas. (T. 366)

Plaintiff received treatment at Springwoods from July 20-24, 2012. His chief complaint was, "I wanted to shoot myself." (T. 385) Triggers for his suicidal ideation were noted to be "not having a job and sitting in his non-air-conditioned trailer day in and day out." (T. 385) He reported a history of paranoia and auditory hallucinations, "but not since age 14." (T. 385) Plaintiff was given Celexa for his depression and Trazodone for sleep disturbance, and it was noted "[b]oth of these medications proved significantly effective in controlling depression and insomnia." (T. 385) Plaintiff participated in group therapy sessions "willfully and enthusiastically," and "[h]e was no problem on the unit." (T. 386) Plaintiff denied any side effects of Celexa. (T. 386) It was noted that "[h]is depression has improved significantly over his stay, today [day of discharge] rating it as a 3 to 4 out of 10, and he denies suicide ideation." (T. 386) He was dreading, however, "going back to the substandard poverty living conditions that he came from." (T. 386) The "minimal cost of medications" was discussed with Plaintiff, and he was told to follow up at Western Arkansas Counseling and Guidance Center ("WACGC") for any needed help. (T. 386) His condition on discharge was "stable and improved," and his prognosis was "fair, depending upon the patient's compliance with medications." (T. 386)

The evidence of record contains no treatment records from WACGC.

At the administrative hearing held five months later on December 13, 2012, Plaintiff testified

that he took half of the Celexa that Springwoods had given him, and he stopped taking it because "it wasn't doing anything for me." (T. 45) No doctor told him to stop taking Celexa. (T. 45) He confirmed that he was not currently seeing a doctor, nor was he taking any medication. (T. 42) When asked about the referral to WACGC, Plaintiff testified that he made regular visits with them (again, there are no records from WACGC), and that, "basically, he told me it would mess with the disability case." (T. 46). An ALJ may properly consider a claimant's noncompliance with a treating physician's directions, *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001), including failing to take prescription medications, *Riggins v. Apfel,* 177 F.3d 689, 693 (8th Cir. 1999), and failing to seek treatment, *Comstock v. Chater*, 91 F.3d 1143, 1146-47 (8th Cir. 1996). *See also Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007)(lack of formal treatment by a psychiatrist, psychologist, or other mental health professional is a significant consideration when evaluating Plaintiff's allegations of disability due to a mental impairment).

That the ALJ failed to discuss the records from Summit and Springwoods does not mean that he did not consider them. The ALJ specifically stated that he had carefully reviewed the entire record before making his findings of fact and conclusions of law (T. 12), and there is no indication that he did not. An ALJ does not need to address each and every piece of evidence in the record. *See Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010).

In sum, this Court cannot agree with Plaintiff that the ALJ gave improper weight to the opinions of non-treating practitioners as opposed to Plaintiff's treating physicians. Dr. Spray was not a "treating physician" as Plaintiff contends, and Dr. Spray's opinions, to the extent that they express marked limitations in Plaintiff's social and adaptive functioning, are inconsistent with and are contrary to the medical evidence as a whole. Plaintiff's subsequent treatment at Summit and

Springwoods was triggered by "not having a job" and his poor living conditions. The physician at Springwoods reported that Plaintiff's depression was significantly improved by the time of his discharge, and he was instructed to follow up with WACGC for help if needed. Plaintiff discontinued taking his prescribed medication, and he chose not to pursue follow up care from WACGC because it may "mess with [his] disability case." Taking the evidence of record as a whole, the weight given by the ALJ to the various medical experts expressing opinions about Plaintiff's condition and limitations, and the ALJ's RFC determination, is supported by substantial evidence.

### B.  Failure to Evaluate GAF Scores

Plaintiff next argues that the ALJ erred in failing to evaluate Plaintiff's GAF scores. Plaintiff points to evidence that he was assessed with GAF scores of 20, 40, and 40-50, indicating serious symptoms of mental illness or serious impairment in social or occupational functioning, and that reversal is required because the ALJ completely ignored his GAF scores. (Doc. 10, pp. 13-15) For the reasons discussed below, this argument lacks merit.

The GAF (Global Assessment Functioning) score is a subjective determination that represents "the clinician's judgment of an individual's overall level of functioning." *Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010). The failure to reference a GAF score is not, standing alone, sufficient ground to reverse a disability determination. *Id*., citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002). Quoting from *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 511 (6th Cir. 2006), the Court in *Jones* stated, "[a]ccording to the [Diagnostic and Statistical Manual's] explanation of the [Global Assessment Functioning] scale, *a score may have little or no bearing on the subject's social and occupational functioning . . . [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a [Global Assessment*

-16-

*Functioning] score in the first place.*" (Emphasis added.) The Court went on to state that the Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and [Supplemental Security Income] disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings,'" and that denials of disability benefits where applicants had GAF scores of 50 or lower have been affirmed. *Jones*, 619 F.3d at 974-75.

In the present case, the evidence of record shows that Plaintiff had not sought any mental health treatment for at least eight (8) years prior to his application for disability benefits. (T. 299, 385) During two emergency room visits in the year prior to his application for disability benefits, Plaintiff denied any mental health complaints. (T. 240, 272) During his visit with consultive examiners, Plaintiff's appearance was appropriate and clean; he was cooperative; his speech was normal; his thought processes were logical and relevant; his thought content was normal, with no delusional material, overvalued ideas, bizarre obsessions, or preoccupations; and, no behaviors suggestive of perceptual abnormalities were observed. He was oriented as to time, place and person; had adequate memory and concentration; and, his mental status exams revealed only mild to moderate functional limitations. (T. 306-309, 342-348) The evidence of record also shows that Plaintiff had been married for over three years, with the separation resulting from his "drinking and stay[ing] out too long" and not from some deficit in social functioning. (T. 342) He lived with a girlfriend for close to a year in 2010-2011. (T. 280, 293, 343) He never repeated a grade in school. He did not drop out of school because of any mental condition, but instead, because he was not getting along with his parents as a result of his partying, and he thought he could work and be successful some other way. (T. 342) He worked at Tyson for a year or so, a job he quit not because

of inability or any mental functional impairment, but because he got tired of it. (T. 37-38, 342) And, as mentioned above, after an acute episode of depression with suicidal ideation, which responded well to medication, Plaintiff quit taking the medication and he sought no further mental health care because he thought it would "mess with" his disability claim. *See Banks v. Massanari*, 258 F.3d 820, 825-26 (8th Cir. 2001)(ALJ properly discounted claimant's complaints of disabling depression as inconsistent with daily activities and failure to seek additional psychiatric treatment).

Upon such evidence as a whole, and despite his GAF scores, the ALJ could adequately determine that Plaintiff's mental impairments only mildly to moderately affected his ability to work. The ALJ's RFC assessment, limiting Plaintiff to work involving simple tasks and simple instructions, and requiring only incidental contact with others, appropriately accounted for Plaintiff's mental health symptoms.

### C.  Failure to Follow Proper Legal Standards

Plaintiff's final argument is that the ALJ failed to follow the proper legal standards in evaluating Plaintiff's subjective complaints, medical records and RFC. Plaintiff contends that the ALJ did not evaluate his subjective credibility based on the *Polaski*[4] factors. (Doc. 10, p. 17) The record shows otherwise.

While the ALJ did not specifically recite the *Polaski* factors for assessing a claimant's credibility, the ALJ did state that in making his findings he considered all symptoms and the extent to which such symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929 and SSRs 96-4p and 96-7p. (T. 15) These regulations broadly mirror the *Polaski* factors, and SSR 96-7P

---

[4] *Polaski v. Heckler*, 739 F.2d 1320, 1321-22, 751 F.2d 943, 948 (8th Cir. 1984).

tracks and expands on those factors.

A credibility determination is a question of fact left to the Commissioner to decide. The question is not whether the evidence supports the existence of an impairment, but whether the evidence of record as a whole can support the claimant's allegations of disabling symptoms. *See Benskin v. Bowen*, 830 F.2d 878 (8th Cir. 1987). If there are inconsistencies in the evidence of record as a whole, the ALJ is free to disbelieve the claimant's subjective complaints and find them not credible. *See Cruse v. Bowen*, 867 F.2d 1183, 1186 (8th Cir. 1989).

The Eighth Circuit has held, "[t]he ALJ is in the best position to guage the credibility of testimony and is granted great deference in that regard." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). If the ALJ discredits a claimant's credibility and gives good reason for doing so, the Eighth Circuit will defer to the ALJ's judgment even if the ALJ does not cite to *Polaski* or discuss every factor in depth. *See Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007); *Buckner v. Astrue*, 646 F.3d 549, 558-559 (8th Cir. 2011).

In the present case, the ALJ appropriately recognized the proper legal standard for evaluating a claimant's subjective credibility by referring to the Social Security regulations and rulings that reflect and expand on the *Polaski* factors. The ALJ discussed several inconsistencies in the record and gave good reasons to discount Plaintiff's credibility. The ALJ found that Plaintiff had only mild restrictions in performing activities of daily living, including chores like laundry, cooking and washing dishes. (T. 13) This is supported by Dr. Nichols' findings (T. 308), and also by a Function Report dated May 24, 2012, in which Plaintiff reported that he has "no problem" with personal care, that he prepares his own meals, does laundry, goes out alone, shops in stores (although not often or for very long), talks to his mother on the phone, and regularly goes to Dollar General and maybe the

-19-

gas station if his brother has time. (T. 222-225) *See Lawrence v. Chater*, 107 F.3d 674, 676 (8th Cir. 1997)(ability to dress and bathe and do some housework, cooking, and shopping contradicted complaints of disabling pain).

The ALJ commented that even though Plaintiff has had his problems with borderline intellectual functioning, schizophrenia and personality disorder for most of his life, he still has a history of working at the substantial gainful activity level. (T. 17) Despite Plaintiff's testimony that he "could have" worked through 2010 (T. 34), his earnings records reflect that he actually earned $10,767.43 in 2010. (T. 145, 155-156) Plaintiff's earnings records also reflect employment over the course of many years. (T. 145, 150-156) *See Gowell v. Apfel*, 242 F.3d 793, 798 (8th Cir. 2001)(claimant worked for years with her allegedly disabling impairments).

The ALJ addressed the fact that the medical evidence fails to show that Plaintiff required consistent treatment in the last several years, thus indicating that his condition had not substantially worsened. (T. 17) In fact, there are no mental health treatment records in the medical evidence prior to Plaintiff's application for disability benefits[5] and, as mentioned above, the only medical records available during that time reveal that Plaintiff denied any mental health complaints. (T. 240, 272, 289) That Plaintiff had not been seeing any doctor for mental health issues is confirmed in numerous records, including: his Disability Report - Adult dated November 30, 2011 (last mental health physician mentioned was in 2001)(T. 182-185); his Disability Report - Appeal dated May 11, 2012 (no worsening of condition; only additional medical was evaluation by Dr. Nichols)(T. 203-207); and, Dr. Evans' report dated February 9, 2012 (no treatment in 8 years)(T. 299). The medical

---

[5] Certain records requested from Comprehensive Mental Health Services, Inc. in Independence, MO could not be obtained because they "exceeded the storage time on a closed chart" and had been destroyed. (T. 297)

evidence of record also shows: Plaintiff was not taking any medication for his mental conditions (T. 181, 199, 207, 306, 343); he scheduled an appointment with Dr. Spray only upon the advice of his counsel not for treatment (none was given, scheduled or recommended), but for evaluation in connection with his disability claim (T. 342); and, that following his hospitalization for an acute episode of depression from July 19-24, 2012, he discontinued taking prescribed medication and refused to follow up with any additional mental health care because it would "mess with" his disability claim (T. 45-46). *See Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007)(failure to follow a recommended course of treatment weighs against credibility); *Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006)(claimant was continuing therapy on advice of counsel for purpose of establishing entitlement to disability); and, *Hepp v. Astrue*, 511 F.3d 798, 807 (8th Cir. 2008)(claimant lacked consistent medical care).

The ALJ further commented that if Plaintiff were as limited as alleged, it would be expected that Dr. Nichols would have observed greater limitations in Plaintiff's abilities to persist and concentrate, and it would not be expected that he could communicate in an intelligible manner or cope with the typical cognitive demands of basic work tasks as found by Dr. Nichols. (T. 17-18) The ALJ noted that even Dr. Spray's findings were consistent with Plaintiff's moderate limitations in most activities concerning concentration and persistence. (T. 18) Overall, the ALJ concluded that the evidence as a whole did not support Plaintiff's alleged limitations beyond the RFC determination that Plaintiff was limited to work involving simple tasks and simple instructions and requiring only incidental contact with others. (T. 19)

Good reasons were given by the ALJ to discredit Plaintiff's allegations and testimony of debilitating limitations due to his mental conditions. "Where the evidence as a whole demonstrates

inconsistencies, subjective complaints may be discounted." *Burns v. Sullivan*, 888 F.2d 1218, 1220 (8th Cir. 1989) From an examination of the record, the Court finds that the ALJ employed the proper legal standard for evaluating Plaintiff's subjective complaints, and that substantial evidence supports the ALJ's conclusion[6].

### IV.  Conclusion

Having carefully reviewed the record, the Court finds substantial evidence supporting the ALJ's decision denying Plaintiff DIB and SSI benefits. The ALJ's decision should be, and it hereby is, affirmed. Plaintiff's Complaint should be dismissed with prejudice.

DATED this 1st day of May, 2015.

/s/ *Mark E. Ford*
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

---

[6] One additional point bears mention. The ALJ mistakenly used the female pronoun "her" instead of the male pronoun "his" in two instances. (T. 16) Plaintiff argues that the ALJ either "was not reviewing the proper file," or "was completely sloppy and haphazard in writing the opinion," and that the decision "should be overturned based on the ALJ referring to Mr. Vrentas as a female, when in fact, he is a male." (Doc. 10, p. 15-16) Plaintiff cites no legal authority to support such action, and the Court notes that Plaintiff's counsel has also mistakenly referred to Plaintiff using female pronouns on two occasions in his brief. (Doc. 10, pp. 6, 17)